50 P.3d 1004

Rick **ANDERSON**, Plaintiff–Appellant,

v.

James C. **SPALDING**, Defendant–Respondent.

No. 26648.

Supreme Court of Idaho,
Boise, December 2001 Term.

July 2, 2002.

Jim Jones & Associates, Boise, for appellant. Jim Jones argued.

Hon. Alan G. Lance, Attorney General, and Hall, Farley, Oberrecht & Blanton, P.A., Boise, for respondent. Candy W. Dale argued.

SCHROEDER, Justice.

Richard Anderson (Anderson) brought a civil rights claim under 42 U.S.C. § 1983 and a state-law defamation claim against James Spalding (Spalding), Director of IDOC. The claim related to Spalding's decision to terminate Anderson from employment with the Idaho Department of Correction. The district court granted Spalding's motion for summary judgment. Anderson appealed.

## I.

## FACTS AND PROCEDURAL BACKGROUND

In 1994 Anderson was a classified employee of the Idaho Department of Correction (IDOC), holding the position of manager of the Receiving and Diagnostic Unit (RDU). The RDU evaluated and classified inmates entering the state correctional system to determine the appropriate placement and security needs. The RDU was part of the Idaho Maximum Security Institution (IMSI), and Anderson reported to its warden, Arvin Arave.

In June, 1994, a female inmate housed at the RDU reported to Correctional Officer Weeks (Weeks) that Officer Pribble (Pribble) had sexually assaulted her. Weeks's supervisor, Sergeant Smith (Smith), was on vacation, so she reported the inmate's allegations to Anderson. Shortly thereafter, Anderson convened a meeting with the inmate, Pribble, Weeks, and Smith to investigate the allegation. Pribble denied the inmate's allegation. When the inmate was asked about the allegations, she began to cry, apologized to Pribble, and stated that "it wouldn't happen again." Anderson, Weeks, and Smith all concluded that the inmate's allegation had not been true. Smith entered a notation in Pribble's tracking file about the matter, but no further action was taken on the accusation by Anderson or anyone else.

At approximately the same time that the RDU inmate came forward with her allegations, two inmates at the Pocatello Women's Correctional Center (PWCC) filed written complaints alleging that Pribble had sexually molested female inmates at the RDU. The warden of PWCC, Bona Miller, did not act upon the complaints or report them to her superiors. Warden Miller did mention the complaints to Warden Arave and other prison officials at a meeting approximately one month later. In the intervening period another inmate was molested by Pribble. In August 1994, the RDU inmate who had originally accused Pribble filed a written report reiterating the allegations that she had made in June. Shortly thereafter, Pribble was criminally charged for having sexual contact

with female inmates. He eventually pled guilty to these felony charges.

When the accusations against Pribble came to his attention in August, Spalding ordered an investigation. The investigation resulted in a number of recommendations regarding operations at IMSI and RDU, but did not address personnel issues. At some point during or after this internal investigation, IDOC management collected all documents concerning the Pribble matter, including Pribble's tracking file and the investigation file. The documents were then destroyed on the advice of an attorney working for IDOC and with the approval of Director Spalding. Before turning over the documents under his control, Anderson made copies, which he took home. Sergeant Smith also gave Anderson a copy of Pribble's tracking file at some point before giving that file to IDOC management. Anderson took this file to his home as well.

One year later, the Governor requested a formal investigation of the Pribble matter and its handling by IDOC. The Idaho Department of Law Enforcement (IDLE) conducted the investigation, which took five months and included interviews of more than 240 people. Anderson met with IDLE investigators on three separate occasions. He directed his secretary to provide copies of all documents relevant to the Pribble matter that RDU had retained, including duplicates of the documents kept at Anderson's home. Anderson did not turn over to investigators the tracking file that he had received from Sergeant Smith. Anderson later testified that he forgot that Smith had given him the document. Shortly after the beginning of the IDLE investigation, the position of RDU manager was abolished, and Anderson took a voluntary demotion to a human services supervisor position in lieu of a layoff.

According to IDLE personnel, the primary obstacle to its investigation was the fact that many of the relevant documents had been destroyed. The IDLE investigative report was completed in January, 1996. It identified for possible criminal prosecution one IDOC employee, the Administrator of Prisons, who had destroyed the IDOC records. After receiving the IDLE report, the Gover-

nor asked Director Spalding for an explanation of the remedial steps that IDOC had taken and suggested that the Board of Correction consider actions against personnel who did not act appropriately during the matter. Thereafter, Director Spalding accepted Warden Arave's retirement, reassigned the Administrator of Prisons from that post to Warden of IMSI (the position that was vacated by Arave), and gave Warden Bona Miller a written reprimand and two weeks' leave without pay. Director Spalding also instituted further investigation of Anderson's and Sergeant Smith's roles in the Pribble matter.

During this further investigation, Anderson turned over a number of documents that he had been keeping at his home. These were a duplicate set of the documents that Anderson had previously directed his secretary to give to the IDLE investigators. He also submitted to a polygraph examination. During the pretest interview, Anderson revealed that on the previous evening he had discovered at his home the documents that Sergeant Smith had given him from Pribble's tracking file. These documents were then turned over to the polygraph examiner. The results of the polygraph examination were inconclusive.

In July of 1996 Director Spalding gave Anderson notice of contemplated disciplinary action, up to and including dismissal. The notice referred to the director's concerns about Anderson's integrity and judgment, the inconclusive results of his polygraph exam, his failure to turn over documents to IDLE investigators, inconsistencies in his statements to the IDLE investigators, his handling of the RDU inmate's complaint about Pribble, and his failure to report the inmate's complaint to Warden Arave. Anderson responded to the notice through his attorney, but in August he received a memorandum from the Director dismissing him. The Director again cited inconsistencies in Anderson's statements to investigators and his failure to turn over documents in his possession as evidence that he failed to cooperate with the investigations of the Pribble matter. He also referred to Anderson's failure to report the RDU in-

mate's complaint to Anderson's supervisor as evidence of his lack of good judgment. Spalding found that Anderson's acts and omissions violated several IDOC policies. He stated that these violations warranted Anderson's termination under Idaho Personnel Commission rules, IDAPA 28.01.01.190.01.a (failure to perform the duties and carry out the obligations imposed by the state constitution, state statutes, or rules of the Department or the Personnel Commission) and 28.01.01.190.01.3 (insubordination or conduct unbecoming a state employee or conduct detrimental to good order and discipline in the Department).

Anderson filed a grievance regarding his dismissal, which was heard by an IDOC review panel. The panel determined that IDOC lacked proper cause to terminate Anderson, recommended that he be reinstated to his position as human services supervisor, and recommended that he be compensated for legal fees he incurred in pursuing the grievance. Director Spalding rejected this recommendation and upheld Anderson's dismissal.

Anderson appealed his dismissal to the Idaho Personnel Commission pursuant to I.C. § 67–5316, and the matter was assigned to a Personnel Commission hearing officer. After conducting an evidentiary hearing, the hearing officer issued findings of fact and conclusions of law in which he concluded that IDOC had failed to prove that Anderson had violated the identified IDOC policies or Personnel Commission rules. The hearing officer ordered Anderson's reinstatement with back pay and benefits and awarded Anderson attorney fees and costs. IDOC petitioned for review by the Personnel Commission pursuant to I.C. § 67–5317. The Personnel Commission affirmed the decision of the hearing officer in all respects. The Personnel Commission also awarded attorney fees and costs to Anderson.

The IDOC appealed the Personnel Commission's decision to the district court pursuant to I.C. § 67–5318. The district court affirmed the Personnel Commission's decision. IDOC was ordered to pay Anderson's attorney fees and costs. IDOC appealed, and the Court of Appeals affirmed.

While appeals from the hearing officer's decision were pending, Anderson filed this action, which is also based upon his termination from IDOC. He seeks compensation under 42 U.S.C. § 1983 for alleged violations of his civil rights and under state defamation law in relation to his termination.

## II.

### STANDARD OF REVIEW

 On appeal from the grant of a motion for summary judgment, this Court employs the same standard to be used by the district court originally ruling on the motion. *Kelso v. Lance*, 134 Idaho 373, 374–75, 3 P.3d 51, 52–53 (2000). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). This Court liberally construes all disputed facts in favor of the nonmoving party, and draws all reasonable inferences and conclusions supported by the record in favor of the nonmoving party. *Kelso*, 134 Idaho at 375, 3 P.3d at 53. If reasonable people could reach different conclusions or draw conflicting inferences from the evidence, the motion must be denied. *Id.* However, if the evidence reveals no disputed issues of material fact, the trial court should grant the motion for summary judgment. *Id.*

 As to issues of law, this Court exercises free review of the trial court's decision. *Bouten Constr. Co. v. H.F. Magnuson Co.*, 133 Idaho 756, 760, 992 P.2d 751, 755 (1999).

## III.

### THE DISTRICT COURT DID NOT ERR BY GRANTING SUMMARY JUDGMENT IN FAVOR OF SPALDING ON THE § 1983 CLAIM

The first issue of law is the federal statute. 42 U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the Dis-

trict of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. This section "was designed as comprehensive, remedial legislation for the deprivation of federal constitutional and statutory rights." *Green v. Dumke,* 480 F.2d 624, 628 n.7 (9th Cir.1973). Anderson seeks damages under section 1983 based on alleged deprivations of his rights to equal protection, procedural due process, and substantive due process. He brings his defamation claim under state law.

### A. Equal Protection

 Equal Protection Clause jurisprudence has been summarized as follows by the United States Supreme Court:

The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990 (1920).

As a general rule, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 398–99 (1961). Accordingly, this Court's cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest. *See, e.g., Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432,

439–441, 105 S.Ct. 3249, 3254–3255, 87 L.Ed.2d 313, 319–321 (1985); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 516 (1976).

*Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1, 12 (1992). Even though a statute or regulation is valid under this analysis, selective or discriminatory enforcement of that statute or regulation may amount to a violation under either the Idaho or United States Constitutions, but only if the challenger shows a deliberate plan of discrimination based upon some improper motive like race, sex, religion, or some other arbitrary classification. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 97 (1996); *Young Elec. Sign Co. v. State,* 135 Idaho 804, 809, 25 P.3d 117, 122 (2001); *Henson v. Dept. of Law Enforcement,* 107 Idaho 19, 23–24, 684 P.2d 996, 1000–01 (1984). A "class of one" may successfully state an equal protection claim, even where the challenged treatment does not follow suspect classifications or punish the exercise of fundamental rights, if he or she was singled out based upon a distinction that fails the rational basis test. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564–65, 120 S.Ct. 1073, 1075, 145 L.Ed.2d 1060, 1063–64 (2000).

Anderson has not alleged that Spalding's actions burdened the exercise of a fundamental right for equal protection purposes, or that they were based upon a suspect classification. His claim depends upon a showing that he was treated differently than similarly situated individuals, and that the distinction was not rationally related to a legitimate state interest.

Anderson cites the Seventh Circuit's opinion in *Olech v. Village of Willowbrook* for the proposition that selective enforcement based entirely upon subjective ill will on the part of a government official amounts to an "arbitrary classification" that fails the rational basis test. 160 F.3d 386 (7th Cir.1998), *aff'd on other grounds, Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). However, on appeal, the United States Supreme Court specifically declined to affirm or reverse that aspect of

the Seventh Circuit's holding. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564–65, 120 S.Ct. 1073, 1075, 145 L.Ed.2d 1060, 1063–64 (2000). Instead, the Court simply held that the Olechs' allegation, that the particular disparate treatment in that case was "irrational and wholly arbitrary," sufficiently alleged that the treatment failed the rational basis test, in order to withstand a motion to dismiss under F.R.C.P. 12(b)(6). *Id.*

The United States Supreme Court has expressed its hesitancy to involve the federal courts in public employment decisions, at least in the context of the Due Process Clause:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

*Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684, 692–93 (1976). The Court was particularly concerned that federal intrusion into public employment situations would result in a situation that would "enable every discharged employee to assert a constitutional claim merely by alleging that his former supervisor made a mistake." *Id.*

The status of the "subjective ill will" theory, as developed in *Olech* and in other Seventh Circuit cases cited by Anderson is not clear, since the Supreme Court did not address that issue. This case resembles in some respects *Ciechon v. City of Chicago,* 686 F.2d 511 (7th Cir.1982). In that case, the Seventh Circuit held that there was an equal protection violation where the city ter-minated only one of two paramedics, despite the fact that both were equally responsible for the welfare of a patient who died after the paramedics responded to a call at his home. The court found that there was an equal protection violation where the evidence showed that there was no fault on the part of either paramedic, but that the city had intentionally, irrationally singled out one paramedic for termination due to pressure exerted by the family of the deceased and the local media. *Id.* at 522. Regardless of the life the subjective ill will theory might have in the Seventh Circuit, the absence of Supreme Court approval in *Olech* and the cautionary language in *Bishop v. Wood* work against adoption of the theory in this case, which, unlike *Ciechon,* there is not a clear cut difference in the treatment of persons identically situated. To adopt the theory in this case would extend the Courts too far into the morass of subjectivity in employment decisions. Traditional contract law and state remedial procedures have afforded Anderson considerable remedies without opening up the myriad of constitutional claims that might be made around ill-advised employment decisions.

## B. Procedural Due Process

Anderson maintains that as a classified public employee, he had a property interest in continued employment. Additionally, under U.S. Supreme Court jurisprudence, he has a liberty interest in his good name and professional reputation. He maintains that he was deprived of both without due process of law. Under the United States Supreme Court cases of *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985), *Arnzen v. State,* 123 Idaho 899, 904, 854 P.2d 242, 247 (1993), and the Idaho Supreme Court case of *Lubcke v. Boise City/Ada Cty. Hous. Auth.,* 124 Idaho 450, 460, 860 P.2d 653, 663 (1993) (summarizing *Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494), he was entitled to a meaningful opportunity to respond to the reasons for termination. He maintained that he was deprived of that meaningful opportunity when Spalding did not give him notice of the preceived real

reasons he was being fired—"as a scapegoat to cover up for the misdeeds of Spalding and other high-ranking IDOC officials." Additionally, he claims that Spalding's failure to follow IDOC's written investigation procedures amounted to a procedural due process violation.

### 1. Property interest

■ The Due Process Clause, found in Section 1 of the Fourteenth Amendment to the United States Constitution, provides, "nor shall any state deprive any person of life, liberty, or property, without due process of law." When a state has conferred a property interest in employment, the Due Process Clause prevents the deprivation of such an interest without appropriate procedural safeguards, which include notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985); *Arnzen v. State*, 123 Idaho 899, 904, 854 P.2d 242, 247 (1993). Spalding does not contest that, under *Arnzen*, Anderson was a classified employee entitled to procedural due process before his employment was terminated.

■ Due process requires that, prior to termination, an employee must be given: a) oral or written notice of the reason(s) for the termination, b) an explanation of the employer's evidence, and c) an opportunity to present his or her side of the story. *Lubcke v. Boise City/Ada Cty. Hous. Auth.*, 124 Idaho 450, 460, 860 P.2d 653, 663 (1993) (summarizing *Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494). However, there does not need to be a full-blown evidentiary hearing prior to the termination, so long as one may be had after the termination, and the requisite opportunity to respond before termination may usually be in writing. *Loudermill*, 470 U.S. at 544–46, 105 S.Ct. at 1494–95, 84 L.Ed.2d at 505–06.

■ Anderson was given a written notice of contemplated disciplinary action, which informed him of Spalding's alleged reasons for his termination and the evidence upon which Spalding was relying. He was given thirty days in which to respond in writing and through his attorney. After his termination, Anderson had a full hearing and a victory in

proceedings before a hearing officer and on appeal. However, Anderson cites *Lubcke*, 124 Idaho 450, 860 P.2d 653, for the proposition that these processes were insufficient because he was not informed of the allegedly real reasons for his termination—alleging that the reason was Spalding's need for a scapegoat to divert attention from his own and other administrative officials' improper conduct. In *Lubcke*, this Court held that, because Lubcke was given pretextual reasons for her termination, she was never given a meaningful opportunity to respond to the true, improper reasons for her termination, and that she had therefore been deprived of due process. *Id.* at 460, 860 P.2d at 663. Additionally, the *Lubcke* Court found several independent procedural due process violations regarding the termination.

The principle underlying *Lubcke* is that giving pretextual reasons for termination may deprive a person of a meaningful opportunity to be heard. In this case it is clear that Anderson was given a fair opportunity to be heard. He was given reasons for his termination. He disputed those reasons and successfully challenged them. He was reinstated with back pay and benefits, as well as costs and attorney fees. The purposes of notice and an opportunity to be heard were fully vindicated in his case.

### 2. Liberty Interest

■ Although defamation by a public employee, in general, does not implicate due process, *Paul v. Davis*, 424 U.S. 693, 709–10, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405, 418–19 (1976), in the specific context of terminations, "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558 (1972). Thus, due process is implicated when, in connection with termination, a public employer makes a charge that might seriously damage the employee's standing and associations in the community, or impose a stigma foreclosing other employment opportunities. *Campanelli v. Bockrath*, 100 F.3d 1476, 1478 (9th Cir.1996). Such a stig-

ma could arise from a charge of "dishonesty" or "immorality." *Id.* The employee must show: 1) some stigmatizing statement, *Id.* at 1480–81; 2) some "temporal nexus" between the statement and the termination, *Id.* at 1483; and 3) that the statement was "substantially false." *Id.* at 1484. Both parties agree that *Roth* stands for the proposition that when this test is met, an employee is entitled to a hearing to clear his or her name.

▆ Anderson was entitled to a name-clearing hearing under this test, however, his claim fails because he was given adequate due process in order to clear his name. He was provided with written notice of the contemplated disciplinary action and an opportunity to respond. He was provided with further process by way of his administrative hearing before the hearing officer. As for the statements by IDOC spokesperson, Mark Carnopis, which Anderson alleges were published in the Idaho Statesman, a local newspaper, under Spalding's direction—the appeals of the hearing officer's decision came after its publication, and they provided additional forums in which Anderson was able to clear his name of any stigma related to the article or the termination.

### C. Substantive Due Process

▆ Anderson claims that the deprivation of his liberty interest in his good name and professional reputation, in concert with being fired for pretextual reasons, constituted a substantive due process violation. A substantive due process claim, under the Fourteenth Amendment, "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261, 273 (1992); *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986) (internal quotation omitted).

Anderson relies on *Adams v. Sewell,* 946 F.2d 757 (11th Cir.1991), for the proposition that a termination based on an improper motive and by arbitrary and capricious means amounts to a substantive due process violation. However, the Eleventh Circuit has overruled *Adams v. Sewell,* noting that sub-

stantive due process only protects those rights that are "fundamental," or "implicit in the concept of ordered liberty." *McKinney v. Pate,* 20 F.3d 1550, 1556, 1559 (11th Cir. 1994) (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292 (1937)). Neither does Anderson's reliance on *Wudtke v. Davel,* 128 F.3d 1057 (7th Cir. 1997) support the claim of a due process violation. The *Wudtke* case did not purport to create a new breed of substantive due process claim based upon defaming a public employee in relation to a termination or giving the employee pretextual reasons. The court held that the claimant had stated a claim for violation of her bodily integrity (which only coincidentally occurred in the workplace), which is an interest the United States Supreme Court had previously recognized as being within the protections of substantive due process. *Id.* at 1062 (citing *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).

The United States Supreme Court has not given definitive guidance as to whether such a termination is a substantive due process violation. However, the Court has expressed its limited view of the scope of substantive due process:

> As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.

*Collins,* 503 U.S. at 125, 112 S.Ct. at 1069, 117 L.Ed.2d at 273 (internal citations omitted).

In light of the careful approach the Supreme Court takes regarding substantive due process, the absence of authority to support Anderson's claim, and the Court's limited view of its role in public employment decisions according to *Bishop,* summary judgment against Anderson was appropriate as to this claim.

## IV.

### THE DISTRICT COURT DID NOT ERR IN HOLDING THAT FILING OF A NOTICE OF TORT CLAIM WAS A PREREQUISITE TO THE DEFAMATION CLAIM

Anderson alleges that Spalding was responsible for the communication of defamatory statements regarding his reasons for termination, including the following: 1) a January 16, 1998 newspaper article in which IDOC spokesman Mark Carnopis commented on the hearing officer's reinstatement of Anderson; 2) Spalding's affidavit supporting IDOC's motion to stay Anderson's reinstatement; and 3) statements to the Corrections Board in relation to Anderson's termination. The district court dismissed this claim based on Anderson's failure to file a notice of tort claim with the Secretary of State.

The Idaho Tort Claims Act, Title 6, Chapter 9 of the Idaho Code, requires that "all claims against an employee of the state for any act or omission of the employee within the course or scope of his employment shall be presented to and filed with the secretary of state within one hundred eighty (180) days from the date the claim arose...." I.C. § 6–905. "No claim or action shall be allowed against a governmental entity or its employee unless the claim has been presented and filed within the time limits prescribed by this act." I.C. § 6–908. Consequently, summary judgment is appropriate where a claimant fails to file his or her claim according to section 6–905. *Mitchell v. Bingham Mem'l Hosp.*, 130 Idaho 420, 422–24, 942 P.2d 544, 546–48 (1997).

Anderson argues that the claim requirement of I.C. § 6–905 does not apply because Spalding was sued in his individual capacity as to the defamation claim and because he was acting outside the course and scope of his employment when the statements were made. The purposes of the notice requirement are to:

(1) save needless expense and litigation by providing an opportunity for amicable resolution of the differences between parties, (2) allow authorities to conduct a full investigation into the cause of the injury in order to determine the extent of the state's liability, if any, and (3) allow the state to prepare defenses. The claim filing statute is usually the only sure and certain means by which the state or its subdivisions may be alerted to potential liability arising from a governmental activity.

*Friel v. Boise City Hous. Auth.*, 126 Idaho 484, 486, 887 P.2d 29, 31 (1994) (quoting *Pounds v. Denison*, 120 Idaho 425, 426–27, 816 P.2d 982, 983–84 (1991). These purposes are irrelevant in a suit between private individuals. In that situation, the plaintiff is not seeking to recover money from the State, and the State has no need of a notice of a claim, because there is nothing for the State to resolve, investigate, or defend against. However, the plaintiff's characterization of a claim is not the end of the inquiry.

The Court has entertained the distinction between suits brought against employees in their official capacity and their individual capacity in relation to I.C. § 6–905. *Pounds v. Denison*, 120 Idaho 425, 427–28, 816 P.2d 982, 984–85 (1991). In *Pounds*, the Court analyzed claims brought against employees in their official capacity separately from claims brought against them in their individual capacity. *Id.* However, the Court did not hold that a plaintiff may be excused from filing a claim with the Secretary of State merely by stating in the pleadings that the employees are being sued "in their individual capacities"—instead, the Court held that in order to survive summary judgment the plaintiff must create a genuine issue of material fact as to whether the statutory presumption has been rebutted. *Id.; see also Overman v. Klein*, 103 Idaho 795, 798, 654 P.2d 888, 891 (1982). Regardless of the way the claim is characterized, the critical question, under I.C. § 6–905, is whether the employee's conduct was within the course and scope of his or her employment.

There is a "rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment and without malice or criminal intent." I.C. § 6–903(e). Acts that are within the scope of employment are "those acts which are so closely connected with what the servant is supposed to do, and so fairly and reasonably incidental to it, that they may be

regarded as methods, even though quite improper ones, of carrying out the objectives of employment." *The Richard J. and Esther E. Wooley Trust v. DeBest Plumbing, Inc.*, 133 Idaho 180, 184, 983 P.2d 834, 838 (1999) (*Wooley*). *Wooley* elaborated that an employee's conduct is within the scope of employment if "it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, *at least in part*, by a purpose to serve the master." *Id.* (emphasis added). *Wooley* did not determine whether a particular set of facts was sufficient to withstand a summary judgment motion, but rather determined that certain jury instructions properly conveyed the these principles. *Id.* The record in this case shows that the acts of Spalding were within the scope of his employment even though the record indicates they were carried out improperly. A notice of tort claim was necessary.

## V.

## CONCLUSION

The decision of the district court granting summary judgment is affirmed. The respondent is awarded costs. No attorney fees are allowed.

Chief Justice TROUT, Justices WALTERS, KIDWELL and EISMANN concur.